**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

CURT JOHN SCOTT,

               Plaintiff,

vs.                                           Case No.  3:08-cv-1075-J-JRK

MICHAEL J. ASTRUE,
Commissioner of Social Security,

               Defendant.

_____/

**OPINION AND ORDER**[1]

**I.   Status**

      Curt John Scott ("Plaintiff") is appealing the Commissioner of the Social Security Administration's final decision denying his claim for disability insurance benefits.  His alleged inability to work is based on the following impairments: "HIV Positive, Chronic Hepatitis C, Blood clots in nose[.]"  Transcript of Administrative Proceedings (Doc. No. 24; "Tr.") at 137; see also Tr. at 20.  After a telephonic hearing held on July 24, 2008, Tr. at 221-45, Plaintiff was found not disabled by an Administrative Law Judge ("ALJ"), in a Decision entered on July 29, 2008.  Tr. at 10-18.  Plaintiff has exhausted the available administrative remedies, and the case is properly before the Court.

      Plaintiff, who is currently incarcerated, represented himself at his telephonic hearing before the ALJ.   Tr. at 221-45.   Prior to his hearing, Plaintiff hired two different

---

[1]     The parties consented to the exercise of jurisdiction by a United States Magistrate Judge, see Notice, Consent, and Order of Reference - Exercise of Jurisdiction by a United States Magistrate Judge (Doc. No. 31), and the Order of Reference was entered on September 23, 2009 (Doc. No. 32).

representatives to assist him in the process of seeking disability insurance benefits.  First, when Plaintiff was living in Maryland, Plaintiff hired Carol Harrison, a "Claimant Advocate" located in Finksburg, Maryland.[2]  Tr. at 82.  Second, after Plaintiff relocated to Florida, in October 2006, he hired Carol Avard, Esquire.  Tr. at 80, 81, 82.  Ms. Avard eventually withdrew from representation on February 22, 2008, about five months before Plaintiff's hearing.  Tr. at 47.  Plaintiff proceeded pro se for the remainder of the administrative proceedings, including his hearing and appeal.  Plaintiff commenced the instant case proceeding pro se, but again retained Ms. Avard to assist him relatively early in the proceedings.[3]  See Notice of Appearance (Doc. No. 14).

Through counsel, Plaintiff filed a brief setting forth the following reasons for seeking judicial review of the Commissioner's final decision: (1) Plaintiff did not knowingly and intelligently waive his right to counsel for the hearing, and he was prejudiced because the Commissioner failed to develop a full and fair record in light of his invalid waiver; (2) Even if Plaintiff did validly waive his right to counsel, the Commissioner did not comply with the heightened duty to develop the record in light of Plaintiff's pro se status and his present incarceration; and (3) The appeals counsel erred in failing to remand Plaintiff's case for further proceedings.  Plaintiff's Brief (Doc. No. 30; "Pl.'s Br.") at 1.  Defendant responds that Plaintiff knowingly and intelligently waived his right to counsel and that the ALJ developed a full and fair record.  Memorandum in Support of the Commissioner's Decision (Doc. No. 34; "Def.'s Mem.") at 8-16.  The undersigned finds that Plaintiff's waiver of his right to be

---

[2]     The beginning date of Ms. Harrison's representation is unclear.

[3]     After Ms. Avard entered a Notice of Appearance, on August 10, 2009, Chantal J. Harrington, Esquire entered a Notice of Appearance (Doc. No. 26) as co-counsel for Plaintiff.

represented during the hearing was knowingly and intelligently made, and that the ALJ fully and fairly developed the record in light of Plaintiff's pro se status.  Accordingly, the Commissioner's final decision is due to be affirmed.

## II.  Facts

Plaintiff, who was born in 1963, was forty-five years old when his hearing was held before the ALJ on July 24, 2008.  Tr. at 225.  Plaintiff's educational background consists of an eleventh-grade education; he is presently working on obtaining his GED.[4] Tr. at 141, 231.  Plaintiff's past relevant work includes working as a pressman for a printing company (from 1987 to 1997 and from 2004 to 2005) and working as a pressroom supervisor for a printing company (from 1997 to 1999 and from 2001 to 2003).  Tr. at 138. Plaintiff alleges that he became unable to work in January of 2005 due to his illnesses causing him to "get very tired," causing his legs to "give out," and causing him to have "dizzy spells, possibly because of the blood clots in [his] nose."  Tr. at 134, 138.  Plaintiff alleges he needed frequent work breaks because of these problems.  Tr. at 138.  Plaintiff was terminated from his position as a pressman on January 25, 2005 due to "poor work performance" as a result of his need for "extra breaks[.]"  Tr. at 138.

### A.    Medical Evidence in the Record

The record contains medical documentation dating back to 1997.  Plaintiff was seen by Francisco L. Andrade, M.D. on September 16, 1997, after an accident at work causing him to have low back pain.  Tr. at 190.  On September 23, 1997, Plaintiff was allowed to

---

[4]        In a Disability Report dated April 15, 2005, Plaintiff indicated he completed the twelfth grade, Tr. at 141-42, but he testified at the hearing that he completed the eleventh grade, and he is working on obtaining his GED.  Tr. at 225.

return to work with the restrictions of "no lifting, pulling or pushing til low back pain symptoms are resolved." Tr. at 191.

On May 12, 2000, Plaintiff returned to Dr. Andrade, reporting that he had tested positive for human immunodeficiency virus at the health department. Tr. at 188. On May 18, 2000, Plaintiff underwent a blood test. Tr. at 213. The results showed "reactive" for "Hepatitis C Antibody[.]" Tr. at 213 (emphasis and capitalization omitted). On June 15, 2000, Plaintiff's physician at the time diagnosed him with hepatitis C, increased liver function tests, and chronic right shoulder pain. Tr. at 154.

During scattered visits between September 2003 and February 2005, Plaintiff periodically reported to Dr. Andrade being anxious and having stress; as such, he was prescribed Xanax. Tr. at 178-87. On February 25, 2005 and on May 9, 2005, Plaintiff was seen by Bibhas C. Bandy, M.D., P.A. because Plaintiff was having nose bleeds. Tr. at 174-76. Dr. Bandy noted Plaintiff had "blood-tinged anterior and posterior nasal discharge." Tr. at 175. Plaintiff was diagnosed with "chronic rhinitis and obstructive septal deformity." Tr. at 175. Plaintiff was prescribed Flonase for his nasal discharge. Tr. at 175.

At the request of the Maryland Disability Determination Services, on June 9, 2005, Plaintiff was examined by Koduah Peprah, M.D. Tr. at 169-72. Plaintiff reported a history of human immunodeficiency disease, chronic hepatitis C, and blood clots in his nose. Tr. at 169. Plaintiff reported smoking one pack of cigarettes per day. Tr. at 170. Plaintiff indicated he was "a recovering alcoholic and he used to use drugs but he denie[d] any [recent] use of drugs[.]" Tr. at 170. Dr. Peprah diagnosed Plaintiff with "HIV infection," "Hepatitis C infection," and "Epistaxis." Tr. at 171.

On September 15, 2005, non-examining physician Kar Dilip, M.D. completed a residual functional capacity ("RFC") assessment.  Tr. at 163-68.  Dr. Dilip opined Plaintiff could occasionally lift fifty pounds, could frequently lift twenty-five pounds, could stand and/or walk for about six hours in an eight-hour work day, and could sit about six hours in an eight-hour work day.  Tr. at 164.  Dr. Dilip opined Plaintiff had no other limitations.  Tr. at 164-66.  It was noted that Plaintiff's "statements about his limitations are not credible."  Tr. at 168.

In a clinic note signed on October 24, 2005, Patricia A. Barditch-Crovo, M.D. wrote that Plaintiff had been diagnosed with human inmmunodeficiency virus and that Plaintiff "appear[ed] to be a long-term nonprogressor."  Tr. at 151.  Plaintiff was also diagnosed with hepatitis C.  Tr. at 151.  However, Dr. Barditch-Crovo noted his "transminases have improved since he stopped drinking alcohol[.]"  Tr. at 151.  Finally, Plaintiff was diagnosed with "[l]eft leg varicosities[.]" Tr. at 152.

On January 31, 2006, a RFC assessment was completed by non-examining physician WD Hakkarinen, M.D.  Tr. at 143-50.  Dr. Hakkarinen assigned the same physical limitations to Plaintiff as previously assigned by Dr. Dilip.  Tr. at 144.  Dr. Hakkarinen also noted Plaintiff's "allegations of pain, shortness of breath, and limitations are not fully supported by medical evidence."  Tr. at 148 (capitalization omitted).

## B.    Pre-Hearing Administrative Proceedings

On February 18, 2005, Plaintiff filed his application for disability insurance benefits in Hagerstown, Maryland, alleging January 25, 2005 as his onset date of disability.  Tr. at 19, 134. On September 19, 2005, Plaintiff's claim was denied.  Tr. at 76-79.  As part of the denial

letter, Plaintiff was advised he could appeal the denial.  Tr. at 78.  Plaintiff was also advised

of the following:

**If You Want Help With Your Appeal**

You can have a friend, lawyer, or someone else help you.  There are groups
that can help you find a lawyer or give you free legal services if you qualify.
There are also lawyers who do not charge unless you win your appeal.  Your
local Social Security office has a list of groups that can help you with your
appeal.

If you get someone to help you, you should let us know.  If you hire someone,
we must approve the fee before he or she can collect it.  And if you hire a
lawyer, we will withhold up to 25 percent of any past due Social Security
benefits to pay toward the fee.

Tr. at 78-79.  After Plaintiff requested reconsideration, Tr. at 75, on February 3, 2006,

Plaintiff's claim for disability insurance benefits was reconsidered and again denied.  Tr. at

73-74.  On March 16, 2006, Plaintiff submitted a Request for Hearing by Administrative Law

Judge.  Tr. at 71.

Sometime in or near the fall of 2006, Plaintiff relocated to Cape Coral, Florida.  Tr.

at 82.  His case was transferred to the Tampa, Florida Office of Disability Adjudication and

Review.  Tr. at 50.  On May 7, 2007, Plaintiff was arrested.  Tr. at 227.  After making bond

on or about May 18, 2007, Tr. at 227, on June 15, 2007, Plaintiff again was incarcerated for

unexplained reasons.  Tr. at 225.  Plaintiff was then convicted of armed robbery for an

offense he committed on November 3, 2006.  See Tr. at 44.  On September 25, 2007,

Plaintiff was sentenced to a term of imprisonment in connection with that conviction, and he

is scheduled to be released from prison on June 9, 2017.  Tr. at 43-44.  After learning

Plaintiff was incarcerated, Ms. Avard withdrew from representation.  Tr. at 47.

In an undated letter, Plaintiff was informed that due to his incarceration at Madison Correctional Institution, which is within the jurisdiction of the Jacksonville, Florida Office of Disability Adjudication and Review, Plaintiff's case was being transferred to that office.  Tr. at 35.   On May 12, 2008, Plaintiff returned a form to the office, indicating he wished to schedule a hearing at the jail.  Tr. at 35.  Plaintiff signed the form, which advised him, inter alia:

> I understand that I have a right to be represented and that if I need representation, the Social Security office or hearing office can give me a list of legal referral and service organizations to assist me in locating a representative.

Tr. at 36.   A telephonic hearing at Madison Correctional Institution was arranged.  Tr. at 103.  On July 1, 2008, a Notice of Telephonic Hearing was sent to Plaintiff, in which Plaintiff was advised, inter alia:

> **You May Choose To Have A Person Represent You**
> If you want to have a representative, please get one right away.  You should show this notice to anyone you may appoint.  You or that person should also call this office to give us his or her name, address, and telephone number.
>
> . . .
>
> **Your Right to Request a Subpoena**
> I may issue a subpoena that requires a person to submit documents or testify at your hearing.  I will issue a subpoena if it is reasonably necessary for the full presentation of your case.  If you want me to issue a subpoena, you must submit a written request.  You should submit the request as soon as possible before the hearing.  The request must identify the needed documents or witnesses and their location, state the important facts the document or witness is expected to prove, and indicate why you cannot prove these facts without a subpoena.

Tr. at 26, 27-28.  On July 8, 2008, Plaintiff completed a form indicating he would be present at the telephonic hearing.  Tr. at 23.  Plaintiff then sent a letter to the ALJ dated July 9, 2008, indicating the following:

Dear Sir,

I Curt John Scott received these documents at Madison Correctional Institution on July 8, 2008 at 9:30 a.m. I would also like to subpoena Karen Jane Taylor. She is my fiancé and also my power of attorney.

She has my most recent medical records before I became incarcerated in D.O.C. She will need travel expenses in advance for gas, food and lodging.

I directed Karen to call your office to make these arrang[e]ments.

Tr. at 24. Plaintiff also provided Ms. Taylor's contact information, including an address and a telephone number. Tr. at 24.

### C.    Hearing Before the ALJ

On July 24, 2008, Plaintiff had a telephonic hearing before the ALJ, at which he and a vocational expert testified. Tr. at 221-45. At the beginning of the hearing, Plaintiff was asked the following:

ALJ: . . . Mr. Scott, it's my understanding that you've been noticed with a right to have representation at this hearing and since you're presiding - - present today without such representation, it's my understanding that you wish to proceed without such representation.

CLMT:     Yes, sir.

Tr. at 223-24. The ALJ went on to explain the informal process of the administrative hearing. Tr. at 224. The ALJ told Plaintiff, among other things, "I'll also have some questions for Mr. Capps, the Vocational Expert. When I finish with my questions for him, I'll give you an opportunity for you to ask him any questions. And if you need some assistance with that, I'll, I'll try to assist you with that. Is that clear?" Tr. at 224. Plaintiff responded, "Yes, sir." Tr. at 224.

Plaintiff was first to testify.  He testified that prior to his incarceration, he "work[ed] with the same company for almost 17 years but it was an on-and-off thing due to [his] situation.  The last time [he] worked for them, they let [him] go because, due to lack of production because [he] couldn't do the hours anymore."  Tr. at 225-26.  Plaintiff was laid off in January 2005.  Tr. at 229.  After he moved to Florida, Plaintiff "worked one week" for a printing company, "but [he] couldn't do the hours."  Tr. at 229.

Plaintiff testified that in prison he is "on squad 16, which is, consists of walking around picking up trash and, and cigarette[] butts, mowing. [He] used to mow but they restricted [him] from that because of [his] ankles and [his] left leg."  Tr. at 230.  In addition, Plaintiff "wear[s] soft shoes" now, instead of boots.  Tr. at 231.  Plaintiff performs his job responsibilities for about three and one-half hours each morning.  Tr. at 231.  Plaintiff testified he had recently been seen by the doctor at the prison, and the doctor "restricted [his] working."  Tr. at 231.  Now, Plaintiff "can sit down and take a rest at periods of time."  Tr. at 231.

Plaintiff testified he is working on obtaining his GED.  Tr. at 231.  In addition, he reads an "AA book," and he writes at night.  Tr. at 235.  He also does word search puzzles.  Tr. at 236.  He does not watch television because he does not enjoy the programs offered by the prison.  Tr. at 235.  He has not yet had any visitors in prison "because [he is] so far away from where, where [he] was residing in Florida."  Tr. at 237.  Plaintiff dresses and showers himself in prison.  Tr. at 238.

Plaintiff indicated he is "seeing a psych doctor in [prison]. [He is] going through depression and some stress and anxiety and [he has] just been, just staying to [him]self." Tr. at 233.

Plaintiff testified that when he was not incarcerated, he enjoyed boating and some fishing, but he did not have very much time for those activities because he worked twelve hour shifts. Tr. at 236. He would travel to the grocery store about once a week. Tr. at 236-37. He would also visit with friends and family. Tr. at 237. Plaintiff did not hold a valid driver's license, as it had been revoked because of several DUI convictions. Tr. at 238, 228-29.

Near the end of Plaintiff's testimony, the ALJ asked Plaintiff the following: "Is there anything else about your situation that you haven't told me, think might not be in this record, that you think I ought to know?" Tr. at 238. Plaintiff responded, "Yes, sir." Tr. at 238. Plaintiff then asked whether the record contained evidence of his "lower back" issues, his "shoulder[]" issues, and the "deviated septum in [his] nose[.]" Tr. at 238-39. The ALJ responded affirmatively to those inquiries. Tr. at 238-39. Plaintiff went on to indicate his liver counts are "getting worse," his "liver's almost enlarged," and "due to the medical help they have in DOC, with [his] condition . . . and the time that [he] ha[s], [he] might not make it out of [prison]." Tr. at 239-40. Plaintiff stated his legs bother him and his ankles swell. Tr. at 240. Finally, Plaintiff again advised he was "seeing a psych doctor and . . . [he was] in the process of being transferred to a psych camp due to [his] depression and anxiety and [he was] stressing out. [He was] not sleeping at night at all. That's basically about it." Tr. at 240.

After Plaintiff testified, the ALJ heard from vocational expert Mark Capps.  Mr. Capps was presented with the following hypothetical:

> Assume I find that the Claimant is 45 years old and has an 11th grade education.  Assume further that I find he can only perform light work and is further limited by the following exertional and non-exertional impairments.  He needs to avoid ladders or unprotected heights.  He needs to avoid the operation of heavy moving machinery.  He needs to avoid unusual stress.  He can only occasionally bend, crouch, kneel, stoop, squat, or crawl.  And he needs to avoid the operation of foot controls.

Tr. at 241.  Based on the hypothetical, the vocational expert testified Plaintiff could not perform his past relevant work.  Tr. at 241-42.  The ALJ then added to the hypothetical:

> Let's go down to entry-level and assume the Claimant has no skills or semi-skills at all and that he is the age I previously described and has the work experience and education previously stated.  Assume further that he could only perform light work, and has the exertional and non-exertional limitations I originally described.  Are there any entry-level jobs the Claimant could perform . . . ?

Tr. at 242.  The vocational expert responded, "Yes, sir," and he identified jobs such as "ticket seller," "warehouse checker," "order clerk, food and beverage," and "table worker[.]"  Tr. at 242.

Plaintiff was asked if he had any questions for the vocational expert, to which he responded, "No, sir."  Tr. at 243.  Plaintiff then stated that "the jobs that he's mentioned [are] basically not a problem.  The problem is, is, is, is trying to get one with the record that [he has] right now."  Tr. at 243.  The ALJ advised Plaintiff that the vocational expert "can't consider that" because it is not "within his area of expertise."  Tr. at 243-44.  Plaintiff indicated he understood the vocational expert could not consider his ability to obtain employment based upon his criminal record, and he indicated generally that he "understood

what [the vocational expert] was saying." Tr. at 244.  The ALJ advised Plaintiff he would issue a written decision.  Tr. at 244.  With that, the hearing was closed.  Tr. at 244.

### III. The ALJ's Decision

When determining whether an individual is disabled, an ALJ must follow the five-step sequential inquiry described in the Code of Federal Regulations, determining as appropriate whether the Plaintiff: 1) is currently employed;  2) has a severe impairment;  3) is disabled due to an impairment meeting or equaling one listed in the regulations;  4) can perform past relevant work;  and 5) retains the ability to perform any work in the national economy.  See 20 C.F.R. §§ 404.1520, 416.920; see also Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004).  The ALJ performed the required five-step sequential inquiry set forth in 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4).  At step one, the ALJ established Plaintiff has not engaged in substantial gainful activity since January 25, 2005 (the alleged onset date). Tr. at 12.  At step two, the ALJ determined Plaintiff suffers from the severe impairments of "hepatitis C; drug and alcohol abuse (in remission); human immunodeficiency virus (HIV) infection; deviated nasal septum; [and] swollen ankles[.]" Tr. at 12. The ALJ also found that Plaintiff suffers from the non-severe impairments of "affective disorder [and] anxiety." Tr. at 12.  At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. at 14.  The ALJ determined Plaintiff "has the [RFC] to perform light work as defined in 20 CFR 404.1567(b)," but he needs to avoid the following: "ladders or unprotected heights; operation of heavy moving machinery; unusual stress;   more than occasional bending, crouching, stooping, kneeling, squatting, and

crawling; [and the] operation of foot controls." Tr. at 14-15.  At step four, the ALJ determined

that Plaintiff is unable to perform his past relevant work as a press operator.  Tr. at 16.  At

step five, the ALJ determined that Plaintiff can perform four different jobs: (1) "Ticket Seller"

and (2) "Warehouse Checker," both light and unskilled jobs that exist in significant numbers

in the national economy, as well as (3) "Order Clerk Food and Beverage" and (4) "Table

Worker," both sedentary and unskilled jobs that exist in significant numbers in the national

economy.  Tr. at 17.  In making this determination, the ALJ recognized Plaintiff's testimony

that he would have trouble obtaining these jobs with his criminal record; however, the ALJ

indicated the inquiry is not whether Plaintiff can obtain employment, rather it is "whether it

is possible for the individual to perform work."  Tr. at 17 (citing 20 C.F.R. § 404.1566).  The

ALJ concluded Plaintiff was not under a disability from January 25, 2005 (the alleged onset

date) through the date of the decision. Tr. at 17-18.

## IV.   Legal Standard

This Court reviews the Commissioner's final decision as to disability[5] pursuant to 42

U.S.C. §§ 405(g) and 1383(c)(3).  No special deference is accorded the application of legal

principles; in turn, findings of fact "are conclusive if ... supported by 'substantial evidence[.]'"

Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001) (quoting Falge v. Apfel, 150 F.3d

1320, 1322 (11th Cir. 1998)).  Substantial evidence has been defined as "'such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Falge,

150 F.3d at 1322 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  A reviewing

---

[5]     "Disability" is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A); see also 42 U.S.C. § 1382c(a)(3)(A).

court may not re-weigh the evidence or substitute its own judgment for that of the Commissioner. <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1210 (11th Cir. 2005). The decision of the Commissioner will not be disturbed, so long as it is supported by substantial evidence. <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1439 (11th Cir. 1997).

## V. Discussion

Plaintiff argues he did not knowingly and intelligently waive his right to counsel. Pl.'s Br. at 1, 6-9. Next, Plaintiff contends he was prejudiced because the ALJ did not develop a full and fair record. <u>Id.</u> at 1, 9-12. Alternatively, Plaintiff argues that even if he did validly waive his right to be represented at the hearing, the ALJ did not comply with his duty to develop the record in light of Plaintiff's <u>pro</u> <u>se</u> status at the hearing. <u>Id.</u> at 12-14. Finally, Plaintiff argues the appeals council erred because it did not remand the case for further proceedings. <u>Id.</u> at 14-15.

### A.    Plaintiff's Waiver of the Right to be Represented at the Hearing

The undersigned first examines the validity of Plaintiff's waiver of his right to be represented at the hearing. A claimant has a statutory right to be represented at a hearing before an ALJ. <u>See</u> 42 U.S.C. § 406; <u>see also</u> <u>Smith v. Schweiker</u>, 677 F.2d 826, 828 (11th Cir. 1982). The Commissioner "has a duty to notify a claimant of his or her right to counsel before the hearing." <u>Smith</u>, 677 F.2d at 828. In that regard, the Commissioner must "notify each claimant in writing . . . of the options for obtaining attorneys to represent individuals in presenting their cases before the Commissioner of Social Security." 42 U.S.C. § 406(c). "The representation options of which the claimant must be apprised are the availability of free legal services and the statutory cap on attorney fees of twenty-five percent of any

-14-

eventual award, if applicable." Newberger v. Astrue, No. 3:07-cv-585-J-HTS, 2008 WL 299012, at *2 (M.D. Fla. Feb. 1, 2008) (unpublished) (citing Edwards v. Sullivan, 937 F.2d 580, 585 (11th Cir. 1991); Smith, 677 F.2d at 829; 42 U.S.C. § 406).  Though the right to be represented may be waived by a claimant, the waiver must be knowing and intelligent.  See Smith, 677 F.2d at 829.

    In Brown v. Shalala, 44 F.3d 931 (11th Cir. 1995), the claimant signed a waiver of her right to counsel prior to the hearing.  Id. at 932.  When the claimant arrived at the hearing, the ALJ inquired into the claimant's waiver, and it became evident that the claimant was confused about her right to representation.  Id. at 933.  Further, the claimant indicated she intended to be represented by her former supervisor, but the supervisor did not attend the hearing.  Id.  After being made aware of these circumstances, the ALJ again advised the claimant of her right to be represented, and the claimant was still having issues understanding the process.  Id.  Eventually, after further explanation and questioning, the claimant agreed to go forward without a representative.  Id.

    Concluding the claimant was "confused by the ALJ's questions concerning representation," the Eleventh Circuit reversed the district court's finding that the claimant knowingly and voluntarily waived her right to counsel.  Id. at 935.  In reversing the lower court, the Eleventh Circuit commented that "[n]othing in [the claimant's] testimony evinces an understanding that she had other options which were either explored or rejected."  Id.  The Court recognized that a notice was sent to the claimant prior to the hearing which informed her that a private attorney might take her case on a contingency fee basis and listed the addresses and telephone numbers of local legal services programs.  Id. at 935 n.6.  However, the Court noted that the ALJ did not ask the claimant whether she sought help

from or intended to contact any of these services, nor did the ALJ attempt to ascertain whether the claimant understood she could obtain representation through those services. Id.

Here, just prior to Plaintiff's hearing, a notice was sent to him, in which Plaintiff was advised of his right to representation at the hearing.  Tr. at 26, 27-28.  At the beginning of the hearing, the ALJ confirmed that Plaintiff had been sent a notice of hearing which informed him of his right to be represented.  Tr. at 223-24.  Plaintiff did not dispute he had received a notice.  Tr. at 223-24.  The ALJ asked Plaintiff, "[S]ince you're presiding - - present today without such representation, it's my understanding that you wish to proceed without such representation."  Tr. at 223-24.  Plaintiff responded, "Yes, sir."  Tr. at 224. Unlike the situation faced by the Eleventh Circuit in Brown, Plaintiff did not at all appear confused about the process.  See Brown, 44 F.3d at 935.

Plaintiff argues the pre-hearing notice was inadequate because it "did not mention anything else about the process of hiring an attorney or representative."  Pl.'s Br. at 8.  More specifically, Plaintiff contends his waiver was invalid because he was not informed of "the contingency nature of payment of representation" or "that he could contact legal services/legal aid if he wanted to find a representative."  Id. at 9.  However, Plaintiff ignores a letter that was sent to him prior to the notice of hearing.  The letter advised Plaintiff that he "ha[d] a right to be represented and that if [he] need[ed] representation, the Social Security office or hearing office [could] give [him] a list of legal referral and service organizations to assist [him] in locating a representative."  Tr. at 36.  Plaintiff signed the letter on May 12, 2008 and returned it to the Tampa Office of Disability Adjudication and Review. Tr. at 36.  In addition, when Plaintiff's initial application was denied on September 19, 2005,

he was advised that if he hired a representative, any representative's fee must be approved, and up to twenty-five percent of any past due benefits would be withheld to pay toward any attorney's fee. Tr. at 79. Furthermore, Plaintiff had hired two different representatives in the past, which indicates he must have been aware of the contingent nature of fees charged. In fact, Plaintiff's fee contract with Ms. Avard contained great detail regarding the approval, amount, and contingent nature of fees. Tr. at 81. It is evident that Plaintiff was aware he could contact legal referral and services organizations to assist him, and that if hired an attorney, the fee would be contingent in nature.

Plaintiff further contends he "suffered from a mental impairment," and because of the mental impairment, combined with Plaintiff's status as being incarcerated, the ALJ should have "explain[ed] with 'greater care' the right to counsel." Pl.'s Br. at 8. With respect to Plaintiff's incarceration, the undersigned notes that Plaintiff did not cite any legal authority in support of his contention that incarcerated individuals are entitled to a greater explanation of the right to counsel. Despite the lack of authority cited, Plaintiff points to his alleged inability to obtain medical records while in prison. Id. However, Plaintiff eventually obtained his prison records and submitted them to this Court. See Compl. (Doc. No. 1) at Ex. A. Apparently attempting to circumvent the fallacy of the contention that being in prison prevented him from having access to his medical records, Plaintiff's counsel asserts "it is unclear how [Plaintiff] even obtained the records between the date of the Appeals Council denial and the filing of his initial complaint but somehow he was able to obtain at least some of his records." Pl.'s Br. at 15. Because Plaintiff was eventually able to obtain the records from prison, his argument that his incarceration prevented him from obtaining the records

necessarily fails.  Furthermore, for the reasons already explained, it is evident Plaintiff was aware of his option to hire a representative or legal counsel despite his incarceration.

Plaintiff's contention regarding a mental impairment appears to be based on the scant medical evidence documenting that he occasionally had problems with anxiety and/or stress. See Tr. at 178-87.  The ALJ recognized such documentation and "resolved doubts in [Plaintiff]'s favor by concluding that he has medically determinable affective disorder and anxiety disorder," both non-severe impairments.  Tr. at 12, 13.  The ALJ stated that the only evidence to support the alleged mental impairments were the prescription for Xanax and Plaintiff's testimony that he was isolating himself in prison because he was anxious and depressed.  Tr. at 13.  "Otherwise, the record does not contain any basis for establishing the existence of any mental illness as of [Plaintiff]'s alleged disability onset date, let alone any documentation that either condition has persisted for any consecutive 12 month period."  Tr. at 13.  Based on the lack of medical documentation in the record supporting Plaintiff's contention regarding mental issues, combined with Plaintiff's demonstration that he understood the right to representation and was willing to forego it, the undersigned finds no error in the ALJ's declination to explain with greater care the right to counsel.  Compare Smith v. Sec'y of Health, Educ. and Welfare, 587 F.2d 857, 860 (7th Cir. 1978) (per curiam) (explaining "[w]here, as here, the record discloses possible mental illness coupled with a misconception as to the role of a lawyer, the ALJ should have, at the very least, explained these interrelated subjects in greater detail and with greater care") (emphasis added).

Finally, in arguing the ALJ acted "egregious[ly]" in his inquiry into Plaintiff's waiver of the right to be represented, Plaintiff relies on the letter he mailed on July 9, 2008 advising the ALJ that he wanted to subpoena his fiancé.  Pl.'s Br. at 9.  It is unclear why the letter was not

mentioned at the hearing.  It is possible that it had not been received by the Jacksonville Office of Disability Adjudication and Review, as the letter is not stamped "received."  See Tr. at 24.  In that case, the ALJ would not have known that the letter existed.  If Plaintiff was concerned that his fiancé had not been subpoenaed, he could have spoken up at the hearing.  Indeed, the ALJ asked Plaintiff if there was "anything else about [Plaintiff's] situation that [Plaintiff had not] told [the ALJ], think might not be in this record, that [Plaintiff thought the ALJ] ought to know?"  Tr. at 238.  Although Plaintiff made several inquiries of the ALJ which indicate Plaintiff wanted to ensure the record was complete, he did not mention or otherwise ask about his fiancé.[6]  Tr. at 238.  Therefore, contrary to Plaintiff's argument, the undersigned finds the ALJ's actions were not egregious.

Based on the foregoing reasons, the undersigned finds Plaintiff's waiver of his right to be represented was knowingly and intelligently made.

### B.    Plaintiff's Right to a Full and Fair Hearing

Notwithstanding the determination that Plaintiff's waiver of representation was valid, the undersigned must examine whether the ALJ met his duty to develop a full and fair record. See Brown, 44 F.3d at 935; Smith, 677 F.2d at 829.  "It is well-established that the ALJ has a basic duty to develop a full and fair record." Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003) (citing 20 C.F.R. § 416.912(d)).  "[W]here the right of representation has not been

---

[6]     In fact, by the time Plaintiff appealed the ALJ's Decision to the appeals council, it appears he abandoned any idea that his fiancé would be helping him.  See Tr. at 219 (Plaintiff's letter to appeals council indicating "I[']m also asking the Appeals Council to retrieve my updated medical records from D.O.C[.] as I do not have access to them and the Appeals Council will see that my medical condition has gotten worse.").

waived, the [ALJ]'s obligation to develop a full and fair record rises to a special duty."[7]

Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997) (internal citations omitted). "By

implication, where counsel has been waived, the special duty to develop the record does not

take effect." Robinson v. Astrue, 235 F. App'x 725, 727 (11th Cir. Apr. 11, 2007)

(unpublished) (citing Brown, 44 F.3d at 934).

"[T]here must be a showing of prejudice before it is found that the claimant's right to

due process has been violated to such a degree that the case must be remanded to the [ALJ]

for further development of the record." Graham, 129 F.3d at 1423 (internal citation omitted).

"The court should be guided by whether the record reveals evidentiary gaps which result in

unfairness or 'clear prejudice.'" Id. (quoting Brown, 44 F.3d at 935). Notwithstanding the

ALJ's duty, "the claimant bears the burden of proving that he is disabled, and, consequently,

he is responsible for producing evidence in support of his claim." Ellison, 355 F.3d at 1276

(citing 20 C.F.R. § 416.912(a); 20 C.F.R. § 416.912(c)).

Plaintiff contends the record was not fully and fairly developed because "[n]one of the

recent medical records were in the file and there is no evidence that the ALJ tried to get the

records." Pl.'s Br. at 11. The most recent treatment documentation in the Transcript of

Administrative Proceedings is dated October 20, 2005. Tr. at 151. On about June 15, 2007,

Plaintiff became incarcerated, and he remained incarcerated at the time of his hearing before

---

[7] "This special duty requires, essentially, a record which shows that the claimant was not prejudiced by the lack of counsel." Smith, 677 F.2d at 829 (citing Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981)). In examining whether a claimant was prejudiced by the lack of counsel, a reviewing court must ensure the ALJ "scrupulously and conscientiously probe[d] into, inquire[d] of, and explore[d] for all the relevant facts." Smith, 677 F.2d at 829 (citing Cowart, 662 F.2d at 735). The Eleventh Circuit has commented on the difference in the two standards as follows: "These two standards appear to differ only in degree. Both require that the ALJ fully develop the record. Both require a showing of prejudice to necessitate a remand to the [Commissioner] for reconsideration. The only discernable difference is that a more specific showing of prejudice is required if [a] claimant did not waive his right to counsel." Kelley, 761 F.2d at 1540 n.2.

the ALJ.  Tr. at 225.  Plaintiff claimed in the letter he wrote to the ALJ that his fiancé had his "most recent medical records before [he] became incarcerated in D.O.C."  Tr. at 24.  As previously explained, if Plaintiff was concerned that his fiancé was not subpoenaed for the hearing, he could have notified the ALJ and failed to do so.  The undersigned declines to find that the record was not fully and fairly developed because Plaintiff's fiancé was not subpoenaed.

Plaintiff further points to the ALJ's failure to make "any effort to obtain the medical records from the correctional institute."  Pl.'s Br. at 11.  However, "a condition that 'is aggravated' during 'an individual's confinement in jail, prison, or other penal institution or correctional facility pursuant to such individual's conviction of an offense committed after October 19, 1980, constituting a felony under applicable law, shall not be considered in determining whether such individual is under a disability for purposes of benefits payable for any month during which such individual is so confined.'"  Brown v. Astrue, No. 3:06-cv-1055-J-TEM, 2008 WL 795333, at *6 (M.D. Fla. Mar. 24, 2008) (unpublished) (citing SSR 83-21, 1983 WL 21358, at *1).[8]  While Plaintiff was proceeding pro se in this matter, Plaintiff submitted his medical records from the Department of Corrections to this Court.  See Compl. (Doc. No. 1) at Ex. A.  The Court has reviewed the records and concludes they document an alleged aggravation of his conditions while Plaintiff has been in prison.  Because they document an alleged aggravation of conditions, such records would have been irrelevant to the ALJ's determination of disability during the period of his incarceration, and in fact, ALJs

---

[8]     "Although Social Security Rulings . . . do not have the force and effect of law, those rulings that are a reasonable and permissible interpretation of the Social Security Act will be given deference by the courts."  Brown, 2008 WL 795333, at *7 (citing Stroup v. Barnhart, 327 F.3d 1258, 1262 (11th Cir. 2003); Fair v. Shalala, 37 F.3d 1466 (11th Cir. 1994)).

are instructed to disregard them.  See SSR 83-21 at *1.  Therefore, the undersigned cannot find that the ALJ failed to develop a full and fair record by declining to obtain Plaintiff's medical records from the Department of Corrections.  See Brown, 44 F.3d at 935.

Plaintiff's submission of his Department of Corrections medical documentation is indicative of Plaintiff attempting to supplement the record.  If Plaintiff has additional medical documentation from October 20, 2005 through the beginning date of his incarceration (if such documentation exists), Plaintiff likely would have submitted the documentation along with the other medical records when filing the instant case.  Furthermore, despite submitting Department of Corrections medical records, Plaintiff has not even attempted to make a showing that prior medical records actually exist, or that they would otherwise change the result reached by the ALJ.

Plaintiff's own testimony shows that the ALJ's result would not change with additional documentation, if such documentation exists.  In response to the vocational expert identifying four jobs that Plaintiff could perform despite his impairments, Plaintiff indicated the jobs were "basically not a problem."  Tr. at 243.  It is evident from the record that Plaintiff thought he could physically perform the jobs; yet, he was concerned that he could not obtain the jobs because of his criminal record.  Tr. at 243.  As the ALJ correctly noted in response to Plaintiff's concern, the relevant inquiry is not whether a claimant can obtain a job; the inquiry is "whether it is possible for the individual to perform work."  Tr. at 17 (citing 20 C.F.R. § 404.1566).  Plaintiff's own testimony confirms that his impairments do not render him unable to engage in substantial gainful activity.  On these facts, the undersigned cannot find "unfairness or 'clear prejudice'" because of the lack of alleged medical documentation from

October 2005 through the date of Plaintiff's incarceration.  Graham, 129 F.3d at 1423 (quoting Brown, 44 F.3d at 931).[9]

## C.    Appeals Council Ruling

Plaintiff further contends the appeals council "erred in failing to remand the case after reviewing [Plaintiff's] pro se letter . . . specifically ask[ing] the Appeals Council to obtain his updated records from the Department of Corrections because he 'did not have access to them.'" Pl.'s Br. at 15 (quoting Tr. at 219).  However, for the reasons stated in part V.B, supra, Plaintiff's prison records would have been irrelevant to the ALJ's determination of disability during the period in which Plaintiff was incarcerated.  Therefore, the appeals council did not err in this regard.

---

[9]        In presenting his argument with respect to both the waiver issue and the fair hearing issue, Plaintiff contends his case is "very similar" to Cregar v. Astrue, No. 3:07-cv-1008-J-JRK, 2009 WL 383388 (M.D. Fla. Feb. 13, 2009) (unpublished).  Pl.'s Br. at 7-12.  Cregar was a case decided by this Court in which the Commissioner's final decision to deny a claim for disability insurance benefits was reversed and remanded because the plaintiff did not validly waive his right to be represented at his hearings, and because the ALJ did not meet his special duty to ensure the plaintiff received a full and fair hearing in light of the invalid waiver. Cregar, 2009 WL 383388, at *13.  The Court disagrees that Plaintiff's case is "very similar" to the Cregar case. Plaintiff's case is distinguishable for five reasons.  First, Plaintiff here did not at all appear confused about his right to be represented at the hearing; the plaintiff in Cregar was confused about the right, and it was evident that he had not even reviewed his file prior to the hearing.  Id. at *6-7.  Despite the plaintiff in Cregar being confused about both his right to representation and the process of the hearing, the ALJ in Cregar did not explain with any detail the right to be represented.  Id.  Second, there is no evidence that the plaintiff in Cregar had previously hired any representatives or attorneys, see generally id., unlike Plaintiff here having hired two representatives prior to his hearing.  Third, the lack of medical documentation in the file in Cregar prevented a medical expert from being able to render an opinion as to whether certain criteria were met with respect to the Cregar plaintiff's alleged mental illness, and the ALJ relied heavily on the medical expert's testimony in finding the plaintiff not disabled.  Id. at *9.  Here, however, the ALJ took into account all documented impairments, and he gave Plaintiff the benefit of any doubt with respect to the mental impairments he alleged, but nevertheless determined they do not render Plaintiff disabled.  Fourth, the ALJ in Cregar did not elicit any responses from the plaintiff or from his wife (who also testified at the hearing) regarding the plaintiff's "daily activities, [his] level of social functioning, [his] deficiencies resulting from the failure to complete tasks, and [his] episodes of deterioration in work settings," topics particularly relevant to the ALJ's consideration of the plaintiff's alleged mental illness.  Id. at *12.  Here, however, the ALJ elicited responses from Plaintiff regarding his daily activities both before prison and during prison, as well as his level of social functioning.  Fifth and finally, the plaintiff in Cregar did not concede, as Plaintiff essentially did here, that he was capable of performing the jobs identified by the vocational expert.  See generally id.

### VI.  Conclusion

Plaintiff's waiver of his right to be represented at his hearing was knowingly and intelligently made.  Furthermore, the ALJ met his duty to ensure Plaintiff had a full and fair hearing.  Plaintiff did not suffer unfairness or clear prejudice such that remand would be required.  Finally, the Court has reviewed the entire file, and finds substantial evidence to support the ALJ's Decision at all five steps of the sequential evaluation process.   In accordance with the foregoing, it is hereby

**ORDERED**:

1.    The Clerk of the Court is directed to enter judgment pursuant to sentence four of 42 U.S.C. § 405(g) **AFFIRMING** the Commissioner's final decision.

2.    The Clerk is directed to close the file.

**DONE AND ORDERED** at Jacksonville, Florida on September 30, 2010.

JAMES R. KLINDT
United States Magistrate Judge

kaw
Copies to:
Counsel of record